**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEW ENGLAND NEWSPAPERS, INC., d/b/a Transcript Newspapers, Respondent.**

**No. 88–1009.**

United States Court of Appeals, First Circuit.

Argued July 28, 1988.

Decided Sept. 12, 1988.

**410**

Collis Suzanne Stocking, Supervisory Atty., with whom Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and W. Christian Schumann, Washington, D.C., were on brief, for petitioner.

Howard M. Kastrinsky with whom Charles J. Mataya and King & Ballow, Nashville, Tenn., were on brief, for respondent.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

This matter is before us on an application for enforcement of an order of the National Labor Relations Board (Board) holding New England Newspapers, Inc. (Company), d/b/a Transcript Newspapers, in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act (Act)[1] by reason of its refusal to furnish to the labor organizations that represent its employees a copy of the contract of sale of its business. We conclude that under the circumstances of this case the action of the Board is entitled to affirmance, and thus issue the requested order.

### The facts

Findings of fact of the Board are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The factual findings of the Board, as set forth below, clearly satisfy this standard.

The Company published two daily and six weekly newspapers from its business locale in Dedham, Massachusetts. Its pressmen were represented for collective bargaining purposes by the Boston Newspaper Printing Pressman's Union No. 3 (Pressman's), and its composing room employees by the Boston Typographical Union No. 13 (BTU).

The Pressman's contract expired on May 31, 1982 but contained a provision that it would continue in effect until a new agreement was reached. The BTU contract also expired on May 31, 1982, but it had no extension provision. It had, however, a clause whereby 25 of the composing room employees would be guaranteed jobs until such time as the newspapers were unable to continue publishing, or the employees retired, resigned, died or were discharged for just cause. It was the Company's position, opposed by BTU, that this guarantee did not survive the expiration of the collective bargain agreement with BTU. The Company, however, honored the other provisions of the BTU contract even after its expiration on May 31, 1982. In fact there is no question that the Company continued to deal with both Pressman's and BTU as the collective bargaining representatives of the employees, and to honor the terms and conditions of the expired contracts until the events here in question took place.

Sometime in early 1986 the Company entered into negotiations to sell the newspapers to Harte–Hanks Communications, Inc. (Harte–Hanks), a fact which shortly thereafter came to the attention of Pressman's and BTU. Pressman's contacted the Company and sought its aid in arranging a meeting with Harte–Hanks for negotiations "relating to [the] wages, hours and other terms and conditions of employment" of the pressmen. BTU sought a meeting with the Company for the purpose of learning the details of the sale "so that [BTU

---

1. 29 U.S.C. §§ 141, *et seq.*

could] begin negotiating the impact, if any," on the composing room employees.

The Company responded on April 14, 1986 by informing Pressman's and BTU that an agreement had been reached to sell all of its assets to Harte–Hanks. It also informed the unions that it understood that Harte–Hanks would not continue to operate the Dedham facility after May 2 and that interested employees could apply for employment at *The Middlesex News,* a newspaper published by Harte–Hanks in Framingham, Massachusetts.

On April 30 a meeting took place between representatives of the Company and of Pressman's and BTU. The Pressman's representative requested a copy of the sales agreement with Harte–Hanks, stating the need to know: (1) whether reserves had been established to cover liabilities which the parties might incur in connection with contract negotiations or effects-bargaining negotiations,[2] (2) whether any provision existed to the effect that the sale would not be consummated unless the Company provided certain protection for the existing employees, (3) whether the sales contract contained any condition relevant to preferential rehiring or seniority carry-over for the existing employees, and (4) whether the sales contract provided a basis for Pressman's to bargain regarding continuation of the terms of the expired collective bargaining contract, or instead only entitled Pressman's to engage in effects bargaining.

In addition to repeating the reasons stated by Pressman's, BTU indicated that it needed a copy of the sales agreement to determine the legal obligations of, and the legal relationship between, the Company and Harte–Hanks and their effects on the expired BTU contract's guarantee of lifetime employment to the 25 composing room employees.

The Company's representative refused to produce a copy of the sales agreement, claiming it was confidential, and indicated that it did not contain any of the sort of provisions which the unions suggested

might exist. He also stated that nothing in the sales agreement's contents obligated Harte–Hanks to hire any of the existing employees, and offered to answer any relevant questions "to the best of [his] ability." He admitted, however, that he had not actually read the agreement himself.

In reply to these statements and the allegation of confidentiality of the agreement by the Company, the unions' representatives offered to allow the Company to delete the sales price from the agreement and promised not to reveal to third parties any of the information in the sales document. These proposals were flatly rejected by the Company, repeating the lack of relevancy and the confidentiality arguments.

The above conversations and postures were thereafter repeated in various ways and on several occasions. The employer continued to insist that the unions had no need to know the contents of the sales agreement which it deemed to be a confidential document. The unions, on the other hand, argued that they needed this information to fulfill their duties as bargaining representatives of the employees, and reaffirmed their willingness to delete the price information and not to reveal the contents to third parties.

At one point Pressman's added an additional ground for requesting the agreement: that it might contain some provision dealing with the terms and conditions of employment while the Company owned the Dedham facility, a contention also rejected by the Company on grounds similar to those previously stated. In the meantime, various proposals were made regarding the effect of the sale on the employees. The Company proposed the payment of four week's severance pay to the pressmen, to which their union consented. Despite its position on the sales agreement issue, the Company indicated its willingness to continue to meet "to negotiate concerning the effects of the sale."

The sale was consummated on May 2, 1987, and Harte–Hanks proceeded to close

---

**2.** "Effects bargaining" is bargaining related to the consequences of an employer closing or selling its place. *First National Maintenance*

*Corp. v. N.L.R.B.,* 452 U.S. 666, 681, 101 S.Ct. 2573, 2582, 69 L.Ed.2d 318 (1981).

the Dedham facility and terminate all the employees.

### The Board's action

Eventually both unions filed unfair labor practice charges against the Company alleging violation of Section 8(a)(1) and (5) of the Act[3] by reason, principally, of the Company's refusal to furnish a copy of the sales agreement to Pressman's and BTU. After investigation, the regional director of the Board issued a complaint against the Company on these grounds. An administrative law judge (ALJ) heard the evidence and concluded that the Company had committed the alleged violations, ruling that the unions had shown that the sales agreement was relevant to the performance of their responsibilities as collective bargaining representatives of the pressmen and the composing room employees. The Board affirmed the ALJ and ordered the Company to produce upon request the copies of the sales agreement, and to resume bargaining over the effects of the sale and reduce to writing and sign any agreements resulting from such bargaining.

### The standard of review

"[O]n an issue that implicates its expertise in labor relations, a reasonable construction [of the Act] by the Board is entitled to considerable deference." *N.L.R.B. v. City Disposal Systems, Inc.*, 465 U.S. 822, 829, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984). *See also N.L.R.B. v. Hearst Publications*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); *El Gran Combo de Puerto Rico v. N.L.R.B.*, 853 F.2d 996, 1001 (1st Cir.1988). "Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute." *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

The courts have refused to enforce orders of the Board as having no reasonable basis in the Act:

(1) when the Board fails to apply the proper legal standard (*Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166 [92 S.Ct. 383, 390, 30 L.Ed.2d 341] (1971)), or

(2) if the Board applies the correct standard but does not give the plain language of the standard its ordinary meaning (*id.* at 166–68 [92 S.Ct. at 390–39]), or

(3) where the Board's interpretation is "fundamentally inconsistent with the structure of the Act" and constitutes an attempt to usurp "major policy decisions properly made by Congress" (*American Ship Building Co. v. N.L.R.B.*, 380 U.S. 300, 318 [85 S.Ct. 955, 967, 13 L.Ed.2d 855] (1965)), or

(4) when the Board's action constitutes movement "into a new area of regulation which Congress ha[s] not committed to it" (*N.L.R.B. v. Insurance Agents*, 361 U.S. 477, 499 [80 S.Ct. 419, 433, 4 L.Ed.2d 454] (1960)).

*See also Ford Motor Co. v. N.L.R.B.*, 441 U.S. at 497, 99 S.Ct. at 1849.

The present case, although not the usual run-of-the mill refusal to bargain situation,

---

**3.** 29 U.S.C. §§ 158(a)(1) and (5). Section 8(a)(1) of the Act states that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." Section 7 of the Act (29 U.S.C. § 157) guarantees employees the right, among other things, "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining...."

Section 8(a)(5) of the Act states in pertinent part that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." Section 8(d) of the Act (29 U.S.C. § 158(d)) defines "to bargain collectively," in pertinent part, as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party...."

does not fall within any of the above exceptions. We find the Supreme Court's counsel in *Ford Motor Co.* to be highly instructive with respect to the role of an appeals court in these cases:

> Congress made a conscious decision to ... delegat[e] to the Board ... the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain. This case, therefore, is one of those situations in which we should "recognize without hesitation the primary function and responsibility of the Board ...," which is that "of applying the general provisions of the Act to the complexities of industrial life ... and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of 'the actualities of industrial relations.' "

*Id.* at 496, 99 S.Ct. at 1848 (citations and footnotes omitted).

### The employer's duty to bargain

■ Under Section 8(d) of the Act, employers are required to bargain in good faith with the representatives of their employees regarding "wages, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d). These subjects are termed "mandatory" subjects of bargaining. *Clear Pine Moulding, Inc. v. N.L.R.B.*, 632 F.2d 721, 728 (9th Cir.1980). The Board's "judgment as to what is a mandatory bargaining subject is entitled to considerable deference." *Ford Motor Co. v. N.L.R.B.*, 441 U.S. at 495, 99 S.Ct. at 1848. Although the employer is not obligated to bargain regarding the *decision* to sell its business, *First National Maintenance Corp. v. N.L.R.B.*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1961), the *effects* of that sale are considered "condition[s] of employment" within the meaning of Section 8(d) of the Act, and thus are a mandatory subject of bargaining as to which bargaining in good faith is required. *Id.* at 680–82.

■ With respect to mandatory bargaining subjects, an employer has an obligation under Sections 8(a)(1) and (5) of the Act, "to provide information that is needed by the bargaining representative for the proper performance of [the bargaining representative's] duties." *N.L.R.B. v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967). *See also Detroit Edison Co. v. N.L.R.B.*, 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed. 2d 333 (1979); *N.L.R.B. v. Truitt Mfg. Co.*, 351 U.S. 149, 152–54, 76 S.Ct. 753, 755–56, 100 L.Ed. 1027 (1956). However, in evaluating the validity of a union's request for information we must keep in mind what the Court said in *Detroit Edison Co.:*

> A union's bare assertion that it needs information to process a grievance does not automatically oblige the employer to supply all the information in the manner requested. The duty to supply information under § 8(a)(5) turns upon "the circumstances of the particular case," and much the same may be said for the type of disclosure that will satisfy that duty.

440 U.S. at 314–15, 99 S.Ct. at 1131 (citations omitted). Thus a balancing is required between the need to know by the union to allow it to effectively carry out its functions as bargaining representative of the employees, and the employer's legitimate right to privacy, in which the relevancy of the information sought and the safeguards provided to the employer to protect its privacy interest are the principal elements to be considered.

■ The Board has determined in this case that the information requested of the employer, *i.e.,* the sales contract, is relevant to the effects bargaining that must take place. Because such a contract has to do with the termination of employment, and thus concerns a "condition of employment," in this circuit it "is presumptively relevant and must be disclosed unless it 'plainly appears irrelevant.' " *Western Massachusetts Electric Co. v. N.L.R.B.*, 573 F.2d 101, 105 (1st Cir.1978). *See also Soule Glass & Glazing Co. v. N.L.R.B.*, 652 F.2d 1055, 1093 (1st Cir.1981). We cannot say that the reasons given by the unions for seeking the sales contract plainly establish such irrelevance. They would

seem in fact to support the contrary conclusion. *See N.L.R.B. v. Acme Industrial Co.*, 385 U.S. at 437, 87 S.Ct. at 568 (the Board is required to find only that there is a "probability that the desired information [is] relevant"). We should note also that the standard for relevancy in these cases is a discovery-type standard, not a trial-type standard.[4] *Id.* at 437, 87 S.Ct. at 568. *See also N.L.R.B. v. Davol, Inc.*, 597 F.2d 782, 787 (1st Cir.1979). Furthermore, in this respect as in other areas previously alluded to, the Board's determination of relevancy is entitled to great deference. *Local 13, Detroit Newspaper Printing & Graphic Communications Union v. N.L.R.B.*, 598 F.2d 267, 272 (D.C.Cir.1979). The first prong of the balancing test is thus clearly met.

Passing on to the second standard, the protection of the employer's privacy rights, we again come upon *Detroit Edison, supra.* In that case the employer expressed a concern regarding the production of employee psychological aptitude testing scores in the face of a union demand for their disclosure. The employer was concerned with the necessity to insure the future integrity of those tests, used as a basis for promotions, and to protect the examinee's privacy interests. To meet these allegations the Court placed safeguards to prevent a breach of the valid privacy interests of both the employer and the employees involved.

In recognition of this issue, the unions in the present case offered to minimize the intrusion into the privacy of the Company's transaction by proposing that the price information in the agreement be deleted and by agreeing to keep the contents of the document confidential. Thereafter, the Board in its order also showed sensitivity to this problem by allowing the Company to strike the irrelevant price information from the contract, and by ordering the Pressman's and the BTU to maintain the confidentiality of the conditions of this contract. These safeguards have narrowed within to-

lerable limits the restricted intrusion into what is primarily a private business transaction, while at the same time permitting the bargaining agents to fulfill their statutory duties toward the employees they represent. Moreover, the Company, despite making the conclusory statement that the Agreement is confidential, has indicated neither the presence of any special circumstances nor the likelihood of some specific harm.

The Board has considered and reasonably applied both prongs of the balancing test. Therefore, *the application of the Board for enforcement of its order is granted.*

---

**4.** While trial evidence is relevant only if it is probative of a consequential fact, *see* Fed.R. Evid. 401, evidence is relevant for discovery purposes even if it only "appears reasonably calculated to lead to the discovery" of evidence which would be admissible at trial. Fed.R.Civ. P. 26(b)(1).