899 F.2d 1222
 134 L.R.R.M. (BNA) 2568
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ISLAND CREEK COAL COMPANY, Laurel Run Mining Company,
Petitioners/Cross-Respondents, District 31, United
Mine Workers of America, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner
(89-5071/5254) Respondent (89-5321).
 Nos. 89-5071, 89-5254, 89-5321.
 United States Court of Appeals, Sixth Circuit.
 April 11, 1990.
 
 Before WELLFORD and DAVID A. NELSON, Circuit Judges, and LAWRENCE ZATKOFF, United States District Judge.*
 PER CURIAM.
 
 
 1
 The United Mineworkers filed a complaint with the National Labor Relations Board against two coal companies for failing to comply with a request for various documents related to the sale of one of the companies. In addition to merger and sales agreements, the requested documents included production forecasts. The latter, the union suspected, might indicate that the companies were contracting work out to a non-union company in violation of a collective bargaining agreement.
 
 
 2
 The NLRB found that both the merger agreements and the production forecasts were relevant to the union's representation of its members, but held that union had failed to demonstrate to the companies the relevance of anything other than the production documents. The Board found, therefore, that the companies had committed unfair labor practices only as to the production documents. Both the companies and the union petitioned for review, and the Board petitioned for enforcement of its order. We shall grant the petition for enforcement.
 
 
 3
 * In September of 1986 Occidental Petroleum, which owned Island Creek Corporation, completed the acquisition of the stock of the Laurel Run Mining Company from Virginia Electric and Power Company (VEPCO). Even before the acquisition, Island Creek Coal Company, a subsidiary of Island Creek Corporation, began to manage the Laurel Run mine. After the acquisition, Laurel Run continued to be operated as a separate entity. In July of 1986 Laurel Run laid off one third of its 300 employees, and it laid off another 100 at the end of 1986.
 
 
 4
 The chronology of the dispute is as follows. In July of 1986, District 31 of the United Mine Workers, which represents the employees of both Island Creek and Laurel Run, became aware that Island Creek was participating in the management of Laurel Run. Pursuant to the collective bargaining agreement, the union requested notification of the sale of Laurel Run. The union again requested notification of the sale on August 12, 1986, and sought assurances that Island Creek would abide by Laurel Run's collective bargaining agreement. Island Creek and Laurel Run responded that the acquisition agreement had not yet been finalized, but they indicated their intention to abide by the collective bargaining agreement.
 
 
 5
 On September 17, 1986, two days after the sale of Laurel Run to Occidental became final, Island Creek notified the union of the sale and again stated it would abide by Laurel Run's collective bargaining agreement. In October of 1986, however, Island Creek's manager of operations accounting notified the union--incorrectly--that Laurel Run had been acquired by the Island Creek Corporation, rather than by Occidental. On October 22, 1986, the union informed VEPCO that the September 17 notification did not satisfy the collective bargaining agreement because it did not supply adequate documentation of the acquisition. On November 10, 1986, VEPCO again notified the union of the acquisition and stated that it was not a sale or transfer of operations within Article I of the collective bargaining agreement.
 
 
 6
 The union made two requests for documents. The first, contained in a letter dated December 4, 1986, covered copies of any management agreements between Island Creek and Laurel Run and copies of the merger and acquisition agreements relating to Occidental's purchase of Laurel Run. On January 13, 1987, Island Creek refused the union's request on the grounds (a) that no grievance was pending and (b) that the information was confidential and not relevant. On February 9, the union charged Island Creek and Laurel Run with unfair labor practices for refusing to provide this information. Union officials were permitted to review some of the documents requested, including the "Laurel Run Agreement and Plan of Reorganization and Merger," at a meeting with representatives of Island Creek and Laurel Run held on April 3. Although the possibility of the union's receiving copies of the documents was discussed, copies were not provided.
 
 
 7
 The second document request, dated February 16, 1987, sought: (1) Laurel Run's daily coal production figures for 1986; (2) documents regarding the amount of coal Laurel Run was to supply to VEPCO; and (3) Laurel Run's annual budget. The union sought to justify the request only on the ground that the documents were necessary to "intelligently and effectively represent" Laurel Run's employees. The union filed an unfair labor practice charge against Laurel Run on April 27 for failing to provide this information. The union later explained, in a letter dated May 5, that the information requested was necessary to determine whether Laurel Run or Island Creek had violated the terms of the collective bargaining agreement. The May 5 letter mentions a change in production at Laurel Run and refers to the "Buffalo Ash Pit Agreements," which it says had been discussed at the April 3 meeting. The letter also explained the request for Laurel Run's budget:
 
 
 8
 "The information requested in Item 3 of the February 16 request was based upon the deposition of one of Island Creek's agents which indicated that an annual projection is provided, not only for Island Creek's mines but also for contract mines, by Division Managers to upper management officials. Thus this information should show the anticipated 1987 production for both the Laurel Run and Buffalo Mining."
 
 
 9
 The references to Buffalo Mining and the "Buffalo Ash Pit Agreements" concern an ash pit being dug on or near Laurel Run property by the Buffalo Coal Company, an independent nonunion company. Before VEPCO sold Laurel Run, it had contracted with Buffalo to dig the pit to dispose of fly ash generated by VEPCO's utility operations. As part of the acquisition, Island Creek took over responsibility for the ash pit; Buffalo, however, continued to perform the actual work. In constructing the pit, Buffalo dug up coal which Island Creek sold to VEPCO.
 
 
 10
 Island Creek agreed on May 18th to give the union Laurel Run's daily coal production reports for 1986 and January of 1987, but it asked the union to explain the relevance of the other requests. In its response dated May 27th the union, without mentioning Buffalo by name, voiced its suspicion that Island Creek was using Buffalo to mine Laurel Run coal: "We believe that the contracting out of the production of coal at Laurel Run constitutes a violation(s) of the NBCWA [National Bituminous Coal Wage Agreement]." The union assured Island Creek at that time that the information provided would not be released to any other coal company or to the media. Officials of the companies and the union met on June 2, and the union was allowed to review more documents. On June 30, however, Island Creek again refused to provide the other production information requested. It did not explain why the union's assurance of confidentiality was not adequate.
 
 
 11
 An administrative hearing on the unfair labor practice charges was scheduled for August 27, 1987. Two weeks before the hearing, Willis Phillips, industrial relations director of Island Creek, wrote to the union to explain Island Creek's position on each request. Island Creek agreed to provide much of the information concerning the sale of Laurel Run as long as the union complied with a confidentiality agreement limiting the information to use by union officials in determining if Island Creek had violated the agreement. As to Laurel Run's annual budget, Island Creek refused to provide the document, stating that "the release of this information could have serious impact on our competitive position and sales." The company did offer to provide, subject to the confidentiality agreement, a chart indicating the Laurel Run's projected production for 1987. The union refused Island Creek's offer.
 
 
 12
 After the hearing, the ALJ issued a decision finding no violation of the Act and dismissing the union's complaint. The NLRB reversed the decision in part. It found that the companies had violated the Act by refusing, after May 27, 1987, to furnish the union with portions of the Laurel Run budget report containing production forecasts for Laurel Run and Buffalo Mining. However, the Board dismissed the union's allegations with regard to copies of the management agreements and the Laurel Run merger documents. Island Creek, Laurel Run and the union petitioned this court for review. The Board cross-petitioned for enforcement of its order.
 
 II
 
 13
 The Board's findings of fact must be upheld if supported by substantial evidence, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951), as must the Board's application of the law to the facts. NLRB v. U.S. Postal Service, 841 F.2d 141, 144 (6th Cir.1988). In reviewing the record, the Board itself must take into account the ALJ's conclusions. Universal Camera, 340 U.S. at 493. Where the Board overturns the ALJ's findings "the reviewing court must examine the record with greater care," NLRB v. Homemaker Shops, Inc., 724 F.2d 535, 545 (6th Cir.1984), but "[t]he 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree." Universal Camera, 340 U.S. at 496. Where a case does not rest on the credibility of witnesses, the Board is "free to substitute its judgment for the [ALJ's]." Sign and Pictorial Union Local 1175 v. NLRB, 419 F.2d 726, 734 (D.C.Cir.1969). Here the case rests largely on documentary evidence.
 
 
 14
 * The companies challenge the Board's conclusion that they had a duty to provide the production projections for Laurel Run and Buffalo. Generally, the duty to bargain collectively under 29 U.S.C. Sec. 158(a)(5) includes a duty to provide relevant information needed by the union to carry out its statutory duties as the employees' bargaining representative. Detroit Edison Co. v. NLRB, 440 U.S. 301, 303 (1979). Relevance is assessed under a liberal, discovery-type standard. NLRB v. Acme Industrial Co., 385 U.S. 432, 437 (1967). The union need not demonstrate that the contract has been violated; if it could, "it would not need to request information." Doubarn Sheet Metal, 243 NLRB 821, 824 (1979). Here, the Board found that the production figures were relevant to the union's suspicion that Laurel Run was subcontracting coal production to Buffalo in violation of the agreement, and substantial evidence supports that conclusion.
 
 
 15
 The union must also show that a reasonable employer would be on notice of the relevance. Ohio Power Co., 216 NLRB 987, 991-92 (1975), enf'd, 531 F.2d 1381 (6th Cir.1976). The companies claim that they could not ascertain that the union sought production data rather than financial figures. Although it was not until the hearing that the union stated specifically that it did not want any financial information, the union's May letters plainly indicated its interest in production data. The letter of May 5th explained that the request for budget information sought annual projections showing "the anticipated 1987 production for both Laurel Run and Buffalo Mining." (Emphasis supplied.) The May 27th letter indicated that "[w]e believe that the contracting out of the production of coal at Laurel Run constitutes a violation(s) of the NBCWA," and cited specific sections of the agreement. This was enough to put a reasonable employer on notice that production figures were sought.
 
 
 16
 On the eve of the hearing the companies offered to provide the anticipated 1987 production for Laurel Run if the union officials signed a confidentiality agreement. The proposed agreement provided that the information could be released only to "representatives or counsel of the UMWA who need to know to ensure that Island Creek Corporation has complied with the Wage Agreement," and it specified that the information could be used in grievance or arbitration proceedings involving Island Creek. The union refused to accept the information on those terms.
 
 
 17
 The union's right to information must be balanced against the employer's "legitimate and substantial" interest in confidentiality, Detroit Edison, 440 U.S. at 314-15, but the employer has the burden of proving that interest. E.W. Buschman Co. v. NLRB, 820 F.2d 206, 209 n. 2 (6th Cir.1987). The Board held that the companies' conclusory statements were inadequate to carry this burden. In its letter of August 10, 1987, Island Creek merely asserted that "[g]iven the fierce competition in the coal industry, particularly in this economy, the release of this information could have serious impact on our competitive position and sales." At the hearing, Marshall Peace, assistant general counsel of the Island Creek Corporation, claimed that there is information in "all of the documents that we're talking about here" that "could provide business injury to Island Creek in the hands of our competitors." One would expect projected production figures in a competitive industry to be confidential, and we might have decided this issue differently as a matter of first impression, but absent a specific explanation of how Island Creek's business might be hurt if the information fell into the wrong hands, we will not second-guess the Board's conclusion that the companies failed to establish a substantial interest in confidentiality.
 
 
 18
 It seems to us, moreover, that the companies probably failed to make the required "facially reasonable accommodation" to the union's request. See Buschman, 820 F.2d at 209. The confidentiality agreement that the companies proposed appears reasonable, but the companies offered production forecasts only for Laurel Run. The union had specifically requested production figures for Buffalo as well. Indeed, such figures were essential for the union to investigate its charge that Laurel Run was subcontracting coal production to Buffalo. The companies denied having the Buffalo figures, but the deposition of a company official seems to indicate otherwise.
 
 B
 
 19
 In challenging the Board's conclusion that the companies were not on notice of the relevance of the merger and sales agreement, the union makes two arguments: first, that the agreements were "presumptively" relevant; and second, that even if they were not, the Board erred in concluding that the union had failed to establish notice of the relevance.
 
 
 20
 Information related to wages, hours, and working conditions is presumptively relevant, Emeryville Research Center v. NLRB, 441 F.2d 880, 887 (9th Cir.1971), and the union need not affirmatively demonstrate the relevance of such information. General Motors Corp. v. NLRB, 700 F.2d 1083, 1088 (6th Cir.1983). Only one case, NLRB v. New England Newspapers, Inc., 856 F.2d 409 (1st Cir.1988), addresses the presumptive relevance of sales agreements. In that case the First Circuit did not, as the union suggests, establish a flat rule that sales contracts are always relevant. Rather, it noted that generally the employer's duty to supply information turns on "the circumstances of the particular case." Id. at 413. The court held that the information was presumptively relevant in the particular case before it, "because such a contract has to do with the termination of employment, and thus concerns a 'condition of employment.' " Id. (citations omitted). There, the employer ceased to exist as a separate entity, and all employees were therefore automatically terminated. Id. at 411. Here, in contrast, Laurel Run continued in operation. New England Newspapers is thus not directly in point.
 
 
 21
 The union argues alternatively that the Board erred in finding that the union failed to demonstrate relevance to the companies. We find substantial evidence to support the Board's conclusion. Unlike the requests for information regarding Buffalo's activities, where the union clearly indicated what violation of the collective bargaining agreements it suspected, here the union merely asserted that the information was necessary to represent the employees intelligently. Such boilerplate is insufficient to establish relevance. Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1099 (1st Cir.1981). Whatever confusion there may have been about who purchased Laurel Run should have been cleared up after VEPCO provided copies of the successorship clause and the companies allowed the union to examine the complete merger agreement. At no time between the April meeting and the administrative hearing did the union renew its request for full copies of the documents. The companies could reasonably have assumed that they allayed the union's concerns about successorship, pension benefits and the like. In Communication Workers of America v. NLRB, 644 F.2d 923 (1st Cir.1981), upon which the union relies, the union had, after taking notes from the documents, "explained in detail the union's need for exact copies." Id. at 925. Here the question of copies was discussed at the April meeting, but never, as far as the record discloses, did the union tell the companies that the result of the discussions was unsatisfactory. The Board did not require the union to prove that "handcopying" the documents was insufficient, but only to explain the relevance of the portions of the agreements it had not already received. The union failed to meet this burden.
 
 
 22
 The Board's petition for enforcement of its order is GRANTED.
 
 
 
 *
 The Honorable Lawrence Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation