UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 96-1198

PROVIDENCE HOSPITAL AND MERCY HOSPITAL,

Petitioners, Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.



PETITION FOR REVIEW OF AN ORDER OF

THE NATIONAL LABOR RELATIONS BOARD



Before

Selya and Boudin, Circuit Judges, 

and McAuliffe,* District Judge. 


Maurice M. Cahillane, with whom Egan, Flanagan and Cohen, 
P.C. was on brief, for petitioners and cross-respondents. 
Vincent Falvo, with whom Frederick L. Feinstein, General 
Counsel, Linda Sher, Associate General Counsel, Aileen A. 
Armstrong, Deputy Associate General Counsel, Linda J. Dreeben, 
Supervisory Attorney, and Lisa R. Shearin, Attorney, National 
Labor Relations Board, were on brief, for respondent and cross-
petitioner.



August 28, 1996



*Of the District of New Hampshire, sitting by designation.

SELYA, Circuit Judge. Petitioners and cross- SELYA, Circuit Judge. 

respondents, Providence Hospital and Mercy Hospital

(collectively, the Hospitals), seek judicial review of an adverse

administrative determination. We deny the petition and enforce

the order of respondent and cross-petitioner, the National Labor

Relations Board (the Board).

I. BACKGROUND I. BACKGROUND

The Hospitals are members of the Sisters of Providence

Health System (SPHS), a chain of not-for-profit institutions

operating in western Massachusetts. The Hospitals' nursing

staffs are unionized and the Massachusetts Nurses Association

(MNA) represents the nurses. Spurred by rumors of an impending

consolidation, an MNA representative, Shirley Astle, wrote to the

president of Mercy Hospital on August 11, 1993, requesting

relevant particulars. The hospital responded that it was too

early to predict the changes that might result from a

consolidation, and that in all events a reduction in force would

likely be restricted to management personnel.

Shortly thereafter SPHS announced plans to consolidate

the Hospitals' administrations. As the first step in the pavane,

it appointed Vincent McCorkle as president and chief executive

officer of both institutions. A letter dated September 28, 1993,

sent to the union by a member of the newly unified management

team, confirmed the earlier assurance that, although management

would be "look[ing] at ways to integrate how [the Hospitals]

provide care," there were no definite plans to downsize the

2

bargaining units. It was simply "too early to determine the

nature and extent of any potential impact on employee working

conditions."

On February 24, 1994, McCorkle sent a letter to the

Hospitals' combined work force. The letter informed the

employees of a perceived "need to adjust . . . staffing levels"

and suggested that this adjustment would be accomplished at least

in part by reduction in force.1 Roughly three weeks thereafter

the Hospitals advised local media outlets that some 200 positions

would be eliminated as part of the ongoing consolidation. A

second press release, distributed later that same week, indicated

that despite management's earlier assurances 198 Mercy Hospital

employees and six Providence Hospital employees had been

cashiered.2

On the very day that McCorkle first announced the

impending reduction in force, SPHS and a competing health-care

system, Holyoke-Chicopee Area Health Resources (HCAHR), signed a

memorandum of understanding (MOU) commemorating their intent to

merge. McCorkle informed the Hospitals' employees of the planned

merger on February 25, 1994. Although this statement hinted at a

further reorganization and possible future efficiencies of scale,

 

1The communique added that the Hospitals had intended to
delay informing workers about these layoffs until plans
crystallized, but that a threatened news leak forced management's
hand.

2The record indicates that thirty-eight of the individuals
laid off at Mercy were nurses. The record is silent, however, as
to whether any nurses were laid off at Providence.

3

McCorkle claimed that no decisions had been made regarding future

staffing. In short order, SPHS and HCAHR submitted applications

to federal and state agencies in an endeavor to gain necessary

regulatory approvals.

On May 5, 1994 with layoffs a reality and with a

merger now in the offing Astle requested a copy of SPHS's

"business plan," saying that the MNA wanted "to begin its

assessment of the merger's impact on the conditions of work for

the RNs MNA represents at Providence and Mercy Hospitals."

McCorkle temporized while forwarding the request to counsel.

Astle wrote again on May 24, complaining that she had received no

substantive response. The Hospitals' lawyer finally replied on

June 2, but he gave MNA's request the back of his hand; the

attorney took the position that SPHS "is a totally separate

corporation," and, therefore, the Hospitals did not have access

to a copy of the desired document (if, indeed, such a document

existed).

MNA chose not to quibble. Instead, it renewed its

request in somewhat altered form. In letters dated July 26 and

August 5, respectively, it set forth a particularized listing of

documents that it wished to examine, a detailed statement of the

reasons underlying its information requests, and the legal basis

upon which the requests rested.3 Regarding the internal
 

3Sandwiched between these requests was a letter from
McCorkle to the Hospitals' employees offering insights anent the
proposed merger. In this missive, dated July 29, 1994, McCorkle
acknowledged that some departments would be amalgamated but
predicted that "most jobs will be saved and moved within the new

4

consolidation, MNA asked that the Hospitals provide copies of (1)

all documents relating to the consolidation (or in lieu thereof,

a detailed explanation of the consolidation); (2) any plans for

further work force reductions at Mercy Hospital; and (3) any

plans regarding changes in the Hospitals' corporate status. As

to the anticipated merger with HCAHR, MNA sought (1) copies of

the MOU and other documents explicating the merger's terms; (2)

plans for, or information about, proposed staffing changes at

Mercy Hospital in consequence of this merger; and (3) all

documents pertaining to the Hospitals' proposed corporate status

within the merged group of facilities. Each request solicited a

response within ten days.

The Hospitals asserted that they needed additional time

to formulate a meaningful response. MNA waited patiently for

more than a month before sending a follow-up letter on September

12. Receiving no immediate response, the union then filed

charges with the Board. As the Board's processing of the

charging papers drew to a close, the Hospitals provided MNA with

some but not all of the requested data, characterizing their

December 29 transmittal as a "response to the NLRB information

charge." The Board's regional director issued a formal complaint

ten days later. In May 1995 on the eve of the NLRB hearing 

the Hospitals supplied MNA with materials explaining their

corporate structure and reaffirming that no further layoffs would
 

system." An attachment hinted at possible future reductions in
force (though claiming that "right now, we have no game plan for
layoffs").

5

result from the internal consolidation. They furnished no data

relating to the proposed merger with HCAHR.

The matter was heard by an administrative law judge

(ALJ) who took evidence and reserved judgment. Three months

elapsed before the ALJ issued his decision. In the interim HCAHR

purported to terminate the MOU. Displeased no little and quite

some, SPHS filed suit in state court alleging breach of the MOU

and seeking, inter alia, specific performance. 

II. THE BOARD'S DECISION  II. THE BOARD'S DECISION

In September 1995 the ALJ published his findings and a

proposed order. He determined that the Hospitals had breached

their duty to bargain in good faith by withholding information

relevant to the performance of the union's undertakings as a

collective bargaining representative, and had thereby violated

the National Labor Relations Act (NLRA), specifically, 29 U.S.C.

158(a)(1) & (5).

The Hospitals took exception to the decision and

appealed to the Board. The Board adopted the ALJ's findings and

rationale,4 albeit modifying the recommended order slightly. See 

Providence Hosp., 320 N.L.R.B. No. 60 (Jan. 31, 1996), 1996 WL 

48263, at *1. In light of this adoption, we recount those

findings as if they were made ab initio by the Board. 

The Board first addressed MNA's requests for
 

4The Board is not obliged to make independent findings or
conduct its own analysis of the factors prompting an order where,
as here, it expressly adopts the ALJ's findings and reasoning.
See NLRB v. Horizon Air Servs., Inc., 761 F.2d 22, 24 n.1 (1st 
Cir. 1985).

6

information regarding the internal consolidation. It adjudged

this information relevant because MNA might well have needed it

"so that it could determine what legal effect if any [the

consolidation] would have on its collective-bargaining agreements

with the hospitals, when it should demand bargaining over the

effects of the transaction," and what effect the restructuring

would have on the bargaining units. See id. at *7. Turning to 

the requests regarding the proposed merger, the Board found that

information to be relevant, even though not directly linked to

terms and conditions of employment. See id. at *8. It explained 

that "MNA needed to know the impact of the proposed [merger] on

its contracts," as well as any other possible effects on the

status of the bargaining units. Id. at *9. Moreover, McCorkle's 

letters to the employees suggested the possibility "that some

decisions might have been made which would affect bargaining unit

employees." Id. 

III. DISCUSSION III. DISCUSSION

We start by reiterating the deferential standard that

obtains when federal courts review orders of the Board. Then,

before moving to specifics, we discuss in general terms the scope

of an employer's duty to disclose relevant information to an

inquiring union.

A. The Standard of Review. A. The Standard of Review. 

When a party challenges the Board's determination that

it has committed an unfair labor practice, an inquiring court

must scrutinize the record as a whole. As to matters of fact,

7

the 

court should uphold the Board's findings if they are supported by

substantial evidence. See Universal Camera Corp. v. NLRB, 340 

U.S. 474, 488 (1951); Teamsters Local Union No. 42 v. NLRB, 825 

F.2d 608, 612 (1st Cir. 1987). As to matters of law, appellate

review is plenary. Nevertheless, appellate courts ordinarily

should defer to the Board's interpretations of the statutes it

must enforce, such as the NLRA, whenever such interpretations

flow rationally from the statutory text. See NLRB v. Town & 

Country Elec., Inc., 116 S. Ct. 450, 453 (1995); NLRB v. Curtin 

Matheson Scientific, Inc., 494 U.S. 775, 778 n.2 (1990). 

B. The Duty to Disclose. B. The Duty to Disclose. 

The NLRA imposes upon employers and unions alike a duty

to bargain in good faith over "wages, hours, and other terms and

conditions of employment." 29 U.S.C. 158(d). The right to

bargain collectively would be little more than a hollow promise

if a bargaining representative did not have the concomitant right

to muster the information needed to conduct that bargaining

effectively. Thus, "[t]he duty to bargain collectively . . .

includes a duty to provide relevant information needed by a labor

union for the proper performance of its duties as the employees'

bargaining representative." Detroit Edison Co. v. NLRB, 440 U.S. 

301, 303 (1979). A breach of this duty constitutes an unfair

labor practice under 29 U.S.C. 158(a)(5).

Stating the rule is not a surefire means of dispelling

all uncertainty. Relevance, like beauty, sometimes lies in the

8

eye of the beholder, and parties can differ about what

information is (or is not) relevant to a union's functions qua 

bargaining agent. Stated in traditional terms, requested

information is relevant if it seems probable that the information

will be of legitimate use to the union in carrying out its duties

and responsibilities qua bargaining agent. See NLRB v. Acme 

Indus. Co., 385 U.S. 432, 437 (1967). Put another way, requested 

information should be deemed relevant if it is likely to be of

material assistance in evaluating strategies that may be open to

the union as part of its struggle to minimize the adverse effects

of the employer's decisionmaking process on persons within the

bargaining unit. See Western Mass. Elec. Co. v. NLRB, 589 F.2d 

42, 48 (1st Cir. 1978). These liberal formulations of the test

make manifest that the relevancy threshold is low and that the

standard is neither onerous in nature nor stringent in

application.5 This is as it should be, for a union cannot be

expected to chart a prudent course without reliable and

reasonably specific information about the employer's plans.

The Board and the courts have put a gloss on the test

for relevancy a gloss that alters the burden of persuasion

depending upon the nature of the data sought by the union. When

"the requested information concerns wages and related information
 

5The standard is analogous to the relevancy standard that
governs in the pretrial discovery process, under which discovery
initiatives are deemed relevant as long as they seem calculated
to lead to the unearthing of admissible evidence. See Acme 
Indus., 385 U.S. at 437 (approving "discovery-type standard"); 
NLRB v. New Eng. Newspapers, Inc., 856 F.2d 409, 414 n.4 (1st 
Cir. 1988) (same).

9

for employees in the bargaining unit, the information is

presumptively relevant to bargainable issues." Soule Glass & 

Glazing Co. v. NLRB, 652 F.2d 1055, 1093 (1st Cir. 1981) 

(citation and internal quotation marks omitted). In such cases

the employer must either disprove relevance or explain why it

cannot furnish the information. See, e.g., NLRB v. Borden, Inc., 

600 F.2d 313, 317 (1st Cir. 1979). By contrast, when the

requested information only indirectly implicates the terms and

conditions of employment, it is the union's burden to demonstrate

the relevance of the information to the performance of its

statutory obligations. See Western Mass. Elec., 573 F.2d at 105. 

Despite this dichotomy, however, the ultimate standard of

relevancy does not vary. Moreover, in both situations it is

necessary to measure relevance under the totality of the

circumstances that obtain in a particular case. See NLRB v. 

Truitt Mfg. Co, 351 U.S. 149, 153-54 (1956). 

Once the Board has made its assessment of whether

particular information must be produced, the standard of review

looms large. At that juncture, a reviewing court should accord

considerable respect both to the Board's determination and to the

factual findings underpinning it. See NLRB v. New Eng. 

Newspapers, Inc., 856 F.2d 409, 414 (1st Cir. 1988). 

C. The Merits. C. The Merits. 

It is against this backdrop that we mull the

assignments of error. The Hospitals interpose both relevancy and

confidentiality objections to the Board's decision concerning the

10

requests for merger-related information. They lodge relevancy

and substantial compliance objections to the Board's decision

concerning the requests for consolidation-related information.

Finally, they question the scope of the Board's order. Although

the applicable legal principles overlap, we treat these five

points separately.

1. Relevance of the Planned Merger. The Hospitals' 1. Relevance of the Planned Merger. 

relevancy objection to the compulsory sharing of merger-related

information is painted with too broad a brush. Whatever

generalities may pertain to proposed mergers in the abstract, the

concrete (and somewhat unusual) factual circumstances surrounding

this proposed merger afford substantial evidence adequate to

support the Board's order.

To be sure, certain management actions that ultimately

may have a significant impact on the terms and conditions of

employment within the bargaining unit are nonetheless beyond the

purview of collective bargaining. In a much-quoted turn of

phrase, Justice Stewart referred to these actions as comprising

"the core of entrepreneurial control." Fibreboard Paper Prods. 

Co. v. NLRB, 379 U.S. 203, 223 (1964) (Stewart, J., concurring). 

The thesis holds that important management decisions, such as

choosing a marketing strategy or liquidating lines of business,

are not concinnous subjects for mandatory collective bargaining

because they "are fundamental to the basic direction of [the]

corporate enterprise." Id. The components forming this core of 

entrepreneurial control are often classified as comprising

11

matters that are "akin to the decision whether to be in business

at all." First National Maint. Corp. v. NLRB, 452 U.S. 666, 676 

(1981). And while such matters are not primarily addressed to

conditions of employment, they may have effects sometimes

profound effects upon those conditions.

Although the content of this core of entrepreneurial

control eludes a precise description, see United Food & 

Commercial Workers, Etc., v. NLRB, 1 F.3d 24, 30-33 (D.C. Cir. 

1993), it is plain that the decision to merge two unrelated

corporate entities falls within it. See International Ass'n of 

Machinists & Aerospace Workers v. Northeast Airlines, Inc., 473 

F.2d 549, 556-57 (1st Cir.), cert. denied, 409 U.S. 845 (1972).6 

Thus, MNA had no right either to veto the decision to merge or to

request information for the purpose of intruding into the

negotiations between the merger partners (SPHS and HCAHR).

Still, there is an important distinction between the

right to bargain about a core entrepreneurial business decision

(a right which a union does not possess) and the right to bargain

about the effects of that decision on employees within a

bargaining unit (a right which, depending upon the overall
 

6We think that mergers involving independent entities are to
be distinguished from internal consolidations involving a
combination or realignment of subsidiaries owned by a common
parent. Such internal consolidations do not require the same
degree of "secrecy, flexibility and quickness" that, according to
Northeast Airlines, 473 F.2d at 557, renders arm's-length mergers 
not easily susceptible of collective bargaining. In any event,
the Hospitals do not contend that the decision to consolidate
internally, as opposed to the decision to merge with an external
partner, comes within the core of entrepreneurial control, and,
accordingly, we express no opinion on the topic.

12

circumstances, a union may possess). After all, subject to

considerations such as relevancy and immediacy, unions generally

enjoy the right to bargain over the effects of decisions which

are not themselves mandatory subjects of collective bargaining.

See First National Maint., 452 U.S. at 681; Northeast Airlines, 

473 F.2d at 557. It follows that, even when a particular

managerial decision is not itself a mandatory subject of

bargaining, the decision's forecasted impact on salaries,

employment levels, or other terms and conditions of employment

may constitute a mandatory subject of collective bargaining.

See, e.g., Holly Farms Corp. v. NLRB, 48 F.3d 1360, 1368 (4th 

Cir. 1995), aff'd, 116 S. Ct. 1396 (1996); New Eng. Newspapers, 

856 F.2d at 413; Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 26 

(1st Cir.), cert. denied, 464 U.S. 892 (1983). Embracing this 

tenet, MNA contends that its requests for merger-related

information were relevant to "effects bargaining," and therefore

should have been honored.

In an effort to parry the union's thrust, the Hospitals

offer two reasons why MNA could not properly predicate these

information requests on a desire to engage in effects bargaining.

They suggest that (1) such bargaining always must await the

culmination of a pending merger (and here, the parties have not

finalized the transaction and may never do so), and (2) even if a

pending merger can sometimes be an appropriate subject of effects

bargaining, the prospects of this particular merger are too dim

and its outline too amorphous to warrant a finding of relevancy

13

(especially since restraint-of-trade laws may limit any detailed

discussions of operating efficiencies until the merger is

consummated). In our view, neither suggestion is convincing.

The Hospitals' contention that effects bargaining (or,

more accurately, the gathering of information preliminary to

effects bargaining) always must await the consummation of a

merger depends almost entirely on their reading of our decision

in Northeast Airlines. That decision however, is incapable of 

carrying the cargo that the Hospitals load on it. For one thing,

the question that we discussed in Northeast Airlines arose in a 

materially different legal posture. There we affirmed the

district court's denial of an injunction sought by a union as a

means of preventing the merger of the employer into an

independent company. See Northeast Airlines, 473 F.2d at 558. 

We hung our decision on the district court's balancing of the

equities standard fare in cases seeking injunctive relief. For

another thing, the union's goal in the Northeast Airlines case 

was to require the employer to incorporate the union's views into

the framework of the contemplated merger. See id. Here, 

however, the union sought neither to halt the merger nor to

meddle in the negotiations between the merging entities.7
 

7Another difference but one to which we attach little
weight is that Northeast Airlines involved the Railway Labor 
Act (RLA), 45 U.S.C. 151-188. We deem it settled that cases
brought under the RLA can inform the decisional process under the
NLRA. See, e.g., Trans World Airlines v. Independent Fed. of 
Flight Attendants, 489 U.S. 426, 426-27 (1989); Lebow v. American 
Trans Air, Inc., 86 F.3d 661, 665-66 (7th Cir. 1996); Brotherhood 
of Locomotive Engineers v. Kansas City So. Ry. Co., 26 F.3d 787, 
795 (8th Cir.), cert. denied, 115 S. Ct. 320 (1994). 

14

Because considerations not present here informed the Northeast 

Airlines court's discussion of the core of entrepreneurial 

control, we think that Northeast Airlines can be reconciled 

easily with authority (to which we subscribe) holding that, as

long as a pending merger is sufficiently advanced, a union is

entitled to request information shown by the totality of the

circumstances to be relevant in order to prepare for effects

bargaining. See Holly Farms, 48 F.3d at 1360 (upholding Board's 

finding that employer's failure to produce merger agreement when

requested pre-merger constituted an unfair labor practice)

(enforcing 311 N.L.R.B. 273, 350 (1993)); Children's Hosp. of San 

Francisco, 312 N.L.R.B. 920, 923 (1993) (ordering disclosure of 

merger agreement because its contents, even before the merger was

consummated, "clearly would have influenced [the union] as to

negotiating tactics, positions, and demands").

This brings us to the Hospitals' second argument. It

is common ground that a union cannot demand bargaining over

effects that are purely speculative, ephemeral, or too far

removed from the underlying activity. See Detroit Edison, 440 

U.S. at 314-15; Northeast Airlines, 473 F.2d at 558. But in this 

instance, the Hospitals themselves presented the planned merger

to their employees and to the media as a fait accompli. Their

press release spoke in categorical terms, and a subsequent

memorandum sent by McCorkle to the employees crowed that the

governing boards of both merger partners "have given final

approval to the proposed [transaction]," subject only to

15

regulatory clearances (which, we note, were subsequently

procured). The same communique mentioned "some specifics" about

the system that would result from the merger, including (1) the

partners' plans to "combin[e] some acute care, non-acute care,

and administrative services" across facilities, and (2)

McCorkle's prediction that "most jobs will be saved and moved

within the new System." A newsletter distributed by the

Hospitals in the same time frame suggested that the merger would

be completed in three to six months. It informed the work force

that, although "right now, [SPHS and HCAHR] have no game plan for

layoffs," the workers should expect "a significant reallocation

of jobs within the new System" at some point.

A union is entitled to plan in advance for likely

contingencies. Under the totality of the circumstances that

existed here especially the employer's expressed confidence

that the merger would take place soon and the emphasis in its

handouts on the reallocation of personnel we believe it was

within the Board's authority to find that the union's professed

need for specifics about the merger's probable impact on the

bargaining unit was reasonable. See Union Builders, Inc. v. 

NLRB, 68 F.3d 520, 523 (1st Cir. 1995) (explaining that employers 

must "divulge information of even merely potential relevance").

In other words, given management's professed near-certainty that

the merger would eventuate and its broad hints that it already

had formulated some ideas relative to future staffing of the new

system, the Board reasonably could find as it did that MNA

16

needed information both about the proposed merger (for the

purpose of bargaining over its effects, if and when necessary)

and the structural attributes of the new system (to determine

whether the collective bargaining agreements would survive the

realignment). Thus, substantial evidence supported the Board's

endorsement of the union's requests for merger-related

information.

We add an eschotocol of sorts. The Hospitals claim

that the ultimate failure of the merger8 takes two bites out of

the Board's case, serving not only to moot the information

requests but also to underscore their prematurity. We are not

persuaded. The relevance of requested information must be

determined by the circumstances that exist at the time the union

makes the request, not by the circumstances that obtain at the

time an agency or a court finally vindicates the union's right to

divulgement. See NLRB v. Arkansas Rice Growers Coop. Ass'n, 400 

F.2d 565, 567 (8th Cir. 1968); Mary Thompson Hosp., 296 N.L.R.B. 

1245, 1250 (1989), enforced, 943 F.2d 741 (7th Cir. 1991). Were 

the law otherwise, an employer would have a perverse incentive to

drag its feet, and a union could lose deserved rights through the

ticking of the clock and the delay inherent in the adjudicatory

process.

2. Confidentiality. The Hospitals' second line of 2. Confidentiality. 

 

8In candor, it is far from clear that the merger is a dead
letter. SPHS's suit against HCAHR is still pending in the state
court. In its complaint SPHS terms the MOU "binding" and asks
for specific performance.

17

defense is that the MOU was subject to a side agreement requiring

the parties to keep all matters pertaining to the merger secret.

We agree with the basic premise on which this defense rests: an

employer's commitment to, or genuine need for, confidentiality

sometimes can constitute an appropriate reason for keeping

documents even documents that are potentially relevant to the

collective bargaining process out of a union's hands. See 

Detroit Edison, 440 U.S. at 319. And when confidentiality is 

properly put in issue, the Board must carefully balance the

employer's need for privacy against the union's need to make

informed decisions in its capacity as the employees' bargaining

representative. See New Eng. Newspapers, 856 F.2d at 413. 

But there is less here than meets the eye. Because

confidentiality is in the nature of an affirmative defense, it is

the employer's burden to demonstrate that the requested

information is shielded by a legitimate privacy claim. See Mary 

Thompson Hosp. v. NLRB, 943 F.2d 741, 747 (7th Cir. 1991); see 

generally Borden, 600 F.2d at 317 (assuming relevancy, it is the 

employer's burden to provide some good and sufficient reason why

the union's request should be denied). Moreover, to permit the

requisite balancing, the employer normally must advance its claim

of confidentiality in its response to the union's information

request. Only in that way will the parties have a fair

opportunity to confront the problem head-on and bargain for a

partial disclosure that will satisfy the legitimate concerns of

both sides. See Mary Thompson Hosp., 943 F.2d at 747. 

18

Setting this principle into motion, the Board has held

that it is untimely for an employer to raise a confidentiality

objection to an information request for the first time after

proceedings before the Board have been commenced. See Detroit 

Newspaper Agency, 317 N.L.R.B. 1071, 1072 (1995). This protocol 

represents a responsible application of the statutory duty to

bargain in good faith, and we must therefore defer to the Board's

expertise. Thus, because the Hospitals failed to follow the

proper procedural sequence and neglected to assert a

confidentiality objection in their exchange with the union, we

reject this line of defense.9

3. Relevance of the Internal Consolidation. The Board 3. Relevance of the Internal Consolidation. 

also found that MNA's requests for information regarding the

consolidation were relevant. This finding cannot seriously be

questioned.

MNA initially sought this information in the summer of

1993. It honed the information requests and renewed them several

times in the succeeding months. Aside from broad denials that

the consolidation would have any effect on the bargaining units,

management's first substantive response came late in 1994 (after

MNA had preferred charges and the Board was on the verge of

issuing a complaint). In the intervening fifteen months (during
 

9The Hospitals' asseveration that they could not explain the
need for confidentiality without revealing privileged information
proves too much. If that was the case, then the Hospitals were
obliged to cite that dilemma in response to the MNA's requests.
They did not do so.

19

which interval MNA made five separate requests for information

about the consolidation) the Hospitals laid off more than 200

workers. In light of the continuing uncertainty about imminent

corporate restructuring uncertainty fed by statements

attributable to management MNA reasonably could have believed

that further changes were in the offing. Consequently, the Board

plausibly could have found as it did that the requested

information had great importance to the union and was, therefore,

relevant. This is especially so in view of the fact that the

collective bargaining agreement at Providence Hospital expired on

December 31, 1994, unless automatically renewed, and MNA had to

decide no later than October 1, 1994 whether to allow the

contract to renew automatically or to reopen negotiations.

The Hospitals offer no convincing rebuttal to the

Board's relevancy finding. As the Board noted, see Providence 

Hosp., 1996 WL 48263, at *7, the Hospitals' position boils down 

to a naked assertion that the union had to take management at its

word that the organizational changes portended no further

alterations in staffing. That is not the way the world works: a

union is not bound to accept management's ipse dixit, especially 

when, as now, the totality of the circumstances indicates that

something else may be afoot. Here, extensive layoffs had

followed past assurances from management, and the union had every

reason to probe. It requested information which, if extant, had

undeniable relevance for the purpose of effects bargaining.

Thus, MNA had a statutory right to receive this information in a

20

timely fashion, or in lieu thereof to receive a contemporaneous

written statement as to some legally sufficient reason why it

could not be produced (say, that no such information existed or

that it was somehow privileged).10

4. Substantial Compliance. We dismiss out of hand the 4. Substantial Compliance. 

Hospitals' suggestion that their belated disclosure of

consolidation-related information cures their default. MNA made

a series of information requests over a period spanning thirteen

months. The Hospitals stonewalled for that entire length of

time. They then furnished some information in December of 1994

(after the Board investigation had begun) and some in May of 1995

(on the eve of the hearing). Even assuming arguendo that the two 

batches of belatedly supplied information in the aggregate

fulfilled the union's requests, the Hospitals' act of contrition

came too late. As the Board explained, the protracted delay that

separated the requests from the divulgement of data could "not be

attributed to the time needed to assemble the information

furnished." Id. at *8. A union is entitled to timely disclosure 

of relevant information. See Capitol Steel & Iron Co. v. NLRB, 

89 F.3d 692, 697 (10th Cir. 1996); Borden, 600 F.2d at 318; 

 

10We reject the Hospitals' contention that public
availability of the requested information obviated the need for
disclosure. The argument is inherently circular: MNA could not
possibly know that all the information was in the public domain
if the Hospitals refused to turn over the requested documents or
to make any other substantive response. At the very least, the
Hospitals had the duty to explain to MNA in a timely fashion that
everything was out in the open. As the Board put it, "the Union
was entitled to hear that [news] directly from the [Hospitals]."
Providence Hosp., 1996 WL 48263, at *8. 

21

Western Mass. Elec., 589 F.2d at 46 n.6. Because the Hospitals 

failed to provide MNA with relevant documentation regarding the

consolidation "as promptly as circumstances allow," Capitol 

Steel, 89 F.3d at 698 (quoting Decker Coal Co., 301 N.L.R.B. 729, 

740 (1991)), the Board's finding of an unfair labor practice is

unimpugnable.

5. The Scope of the Order. We briefly touch upon the 5. The Scope of the Order. 

Hospitals' objection to the Board's remedial order. Some

background is desirable. The ALJ initially recommended that the

Hospitals be required to furnish "in a timely fashion, on

request, information concerning any proposed affiliation or

consolidation of Mercy Hospital and Providence Hospitals with one

another and concerning proposed mergers, consolidations, or

affiliations of Providence and Mercy Hospitals with other health

care providers." See Providence Hosp., 1996 WL 48263, at *11. 

This language contains an evident ambiguity, raising uncertainty

as to whether it applies to all mergers (past and future), or

only to the stalled SPHS/HCAHR merger, or strictly to future

(indeterminate) mergers. The Board removed this ambiguity,

modifying the recommended order "to require the Hospitals to

furnish to [MNA] the information requested in [MNA's] requests of

July 26 and August 5, 1994." Id. at *1 n.1. To the Board's way 

of thinking, this modification "more closely reflects the

violations found." Id. 

The modified order responds to the reality that, here,

an unusual concatenation of events exist, e.g., the Hospitals'

22

presentation of the merger as a done deal, their insistence that

the MOU obligated the signing parties even after HCAHR had

repudiated it, and their stonewalling in the face of repeated

information requests. What is more, by specifying the

information that the Hospitals must disclose, the Board limits

the remedy and leaves future transactions untouched. This step

fits neatly with our belief that each situation is sui generis, 

and that pending mergers may or may not be a proper subject of

effects bargaining (depending on the individualized

circumstances). Based on these considerations, the modification

falls well within the Board's province.

IV. CONCLUSION IV. CONCLUSION

We need go no further. For the reasons elucidated

above, we hold that the Board's decision and order comport with

applicable precedent and are supported by substantial evidence in

the record.

The petition for review is denied. The cross-petition The petition for review is denied. The cross-petition 

for enforcement is granted. Costs will be taxed in favor of the for enforcement is granted. Costs will be taxed in favor of the 

Board. Board. 

23