NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ILLINOIS–AMERICAN WATER
COMPANY SOUTHERN
DIVISION, Respondent.

No. 90–1308.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1990.

Decided June 7, 1991.

Charles P. Donnelly, Jr., Margaret Luke, Washington, D.C., Aileen A. Armstrong, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Joseph H. Solien, St. Louis, Mo., for petitioner.

Robert L. Broderick, R. Michael Lowenbaum, Thompson & Mitchell, St. Louis, Mo., for respondent.

Before WOOD, Jr., POSNER and EASTERBROOK, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The National Labor Relations Board ("Board") seeks enforcement of an unfair labor practice order issued against Illinois–American Water Company ("Illinois–American") on September 22, 1989.[1] The Board affirmed the Administrative Law Judge's ("ALJ") holding that Illinois–American violated section (8)(a)(1) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1), by threatening employees with loss of employment if the bargaining representative, Local No. 13, Office and Professional Employees International Union, AFL–CIO ("Union"), demanded that the terms of the collective bargaining agreement be applied to Illinois–American's computer center employees. The Board also found that Illinois–American violated sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1), by (1) refusing to recognize and bargain with the Union as exclusive bargaining representative of the appropriate bargaining unit; (2) refusing to apply the terms and conditions of the collective bargaining agreement to the computer center employees; and (3) refusing to supply information requested by the Union. We grant enforcement of the Board's order.

## I. BACKGROUND

Illinois–American Water Company is a privately-owned public utility that supplies and distributes water to the general public in certain areas of Illinois. A subsidiary of American Waterworks Company, Inc., Illinois–American is in the mid-American region of the parent company. The mid-American region's headquarters are located in Richmond, Indiana. When the present conflict arose in 1986, the company was divided into a northern division, consisting of district offices in Peoria and Pekin, and a southern division, comprised of district offices in Alton, Granite City, East St. Louis, Cairo and Belleville. The Belleville district office closed in 1987 and is now the site of the corporate office and the computer center.

For many years, the Union has represented the company's southern division employees in two bargaining units.[2] As defined in the 1986 collective bargaining agreement, one unit included "clerical employees, excluding management staff and supervisors" in the Alton district office. The other unit, which the union has represented since 1948 and which is the unit of concern in this petition, included "all office employees in [the Belleville, East St. Louis and Granite City] District Offices, exclusive of supervisory employees and confidential employees, including those employees performing group insurance and/or pension duties."[3]

Before the opening of the computer center, the company's East St. Louis district office employees handled customer inquiries and requests for water service. Customers who visited personally were referred to customer service clerks. Telephoning customers would also be referred to customer service clerks. The actual duties of a customer service clerk included handling requests for the following: water service commencement or termination; billing information; transfer of service; meter checks and replacements; and street leak investigation. When handling customer requests, the clerks physically obtained and viewed account records that were prepared

1. This order is reported at 296 N.L.R.B. 92 (1989).

2. In March 1986, the Union and Illinois–American entered into a three-year collective bargaining agreement. At oral argument, counsel for Illinois–American explained that there has not been a new collective bargaining agreement since the expiration of the 1986 agreement.

3. The record indicates that the Granite City office is no longer staffed with bargaining unit employees. Those employees were transferred to the East St. Louis district office, as were the Belleville district office employees upon the closing of the Belleville office.

by other district office employees. Entry clerks in the district office entered information into route books and then sent their work to the Richmond headquarters. A radix computer was utilized for account investigation.

In 1985, Illinois–American began to consider implementing a computer system to store information and handle customer requests and inquiries. The Union's business representative, Herbert Goodrick, learned about Illinois–American's plans for computerization. Goodrick sent a letter to Illinois–American to request bargaining about possible changes by Illinois–American that would affect employees in the bargaining units represented by the Union. A reply letter from Illinois–American informed the Union that its plans were in the "embryo stage" and that company vice president and southern district manager, Thomas Conner, would meet with Goodrick in July 1986.

The first meeting concerning the changes actually occurred November 25, 1986. Conner and Robert McMillian, then-customer service representative in the East St. Louis office, attended for Illinois–American and Goodrick and unidentified persons represented the Union. At the hearing before the ALJ, McMillian explained that at the November meeting Conner outlined Illinois–American's plans for a computer center, including the company's intention that computer center employees would not be covered by existing union contracts. McMillian testified that Goodrick responded that he would organize the computer center employees if Illinois–American failed to recognize the Union as their representative. The ALJ credited McMillian's testimony despite Goodrick's denial of having made such a statement.

After that initial meeting, the Union repeatedly asserted that it was entitled to represent the computer center employees through the already existing district office bargaining unit, and Illinois–American held to its contrary position. At the hearing before the ALJ, Goodrick testified that

Conner told him privately, in January or February 1987, that Illinois–American would hire twelve new employees and dismiss twelve bargaining unit employees if the Union continued to protest removal of computer center employees from the bargaining unit. Goodrick added that at a March 1987 meeting attended by other Illinois–American supervisors, Goodrick and two Union stewards, Conner asserted that the Union's representation demands would cause Illinois–American to fire unit employees and fill computer center positions with new employees. The hearing testimony given by Goodrick, Conner and a Union steward, Mary Allen, contained discrepancies regarding the actual date of this meeting and the people in attendance. The ALJ credited Goodrick's testimony and found that Conner did make such a threat.

As tension mounted between the Union and Illinois–American over the issue of the computer center employees, an additional problem surfaced. In letters in March and May 1987, the Union requested that Illinois–American supply to the Union the name, address, birth date, social security number, dates employed and employment status of each bargaining unit employee. Illinois–American denied the request in a letter dated May 14, 1987, and asked the purpose of such a request. Illinois–American explained that its concern for the privacy of its employees made it reluctant to release some of the information sought by the Union. The Union responded by letter on May 20, 1987, asserting that the information was necessary for it to fulfill its function in collective bargaining matters. On June 2, Illinois–American responded that it would not supply home telephone numbers or personal information, but enclosed copies of a monthly report of Union dues withheld from regular employees, and a weekly report of dues withheld from temporary employees. These reports listed the district offices where the employees worked. Illinois–American maintained that it would not provide any more information without authorization by the employees.[4]

---

**4.** Illinois–American did not produce any evidence to show that its employees requested

withholding of personal information for privacy reasons.

Dissatisfied by Illinois–American's response, the Union filed its first grievance against Illinois–American on June 2, 1987, and alleged that Illinois–American violated sections (8)(a)(1) and (5) by failing to provide the Union with this requested information.

Problems continued regarding the computerization situation and led to the filing of another grievance by the Union. After a substantial remodelling of the Belleville district office to accommodate the company's new computer system, the company began the hiring and training of the computer center employees. By June 10, 1987, Illinois–American had selected nine East St. Louis bargaining unit employees for the computer center position of customer inquiry representative ("CIR").[5] These employees had held district office positions such as customer service clerk, entry clerk, teller, switchboard operator, and other clerical positions, and all had been in the bargaining unit. These nine CIRs were removed from the East St. Louis bargaining unit on September 26, 1987.

Computer training started on June 16, 1987, and the CIRs received approximately sixty-two hours of computer training by October of 1987. Six district office employees and three district office supervisors who remained in East St. Louis received computer training as well. Each supervisor received roughly forty hours of training. The other employees participated in an average of eight hours of training. The training, although similar to the training of the CIRs, was substantially less extensive.

The computer center opened on September 28, 1987. After computerization, the duties of all of the district employees— CIRs and East St. Louis employees— changed in some fashion, while the end result of their endeavors remained the same. The East St. Louis employees processed customer remittance, prepared deferred payment agreements, and accepted occupancy permits. They then entered their work into the computer. Customers continued personal visits, but for water service or billing inquiries, they were referred to a phone connected with a computer center CIR.

The CIRs maintained customer contact only by telephone. They could handle requests for service or inquiries, but did not manually complete orders. The CIR keyed the requested service into the computer, and the order was transmitted to the appropriate district office. The computers gave the CIR the ability to retrieve customer records directly on the computer screen, thus eliminating the physical record retrieval employed before the computerization. Two CIRs, one having been an East St. Louis entry clerk, entered information into the computer and this replaced the pre-computer entry clerk duty of preparing route books and sending them to the Richmond office.

The CIRs and the East St. Louis unit employees receive slightly different wages and benefits. The CIRs are salaried employees and are paid semimonthly, while the district office employees are paid hourly wages on a weekly basis. Both work similar hours, although computer center employees work between 7:30 a.m. and 6:00 p.m. and the district office employees work from 8:00 a.m. to 4:30 p.m. The computer center employees receive one more holiday than the district office employees. All Illinois–American employees are covered by the same group health insurance and pension programs.

The interchange between the computer center and East St. Louis office is limited to contact by telephone or messenger, or through the computer system. McMillian is manager of the computer facility. He and Conner determine the wages, benefits and hours of the computer center employees. McMillian has the authority to fire or discipline computer employees, but Conner oversees McMillian and may be consulted if severe discipline is involved. Conner executes the collective bargaining agreements for southern division employees and participates in grievance procedures for those employees. The immediate supervisor of

---

**5.** Illinois–American eventually transferred three more East St. Louis unit employees to the computer center. One of these three filled a supervisory position.

the computer center employees, Colleen Bromley, was a customer service supervisor of unit employees at the East St. Louis office before the opening of the computer center.

The Union filed its second grievance against Illinois–American on September 14, 1987. The Union stated that beginning March 17, 1987, Illinois–American had interfered with, restrained and coerced its employees in exercise of their section 7 rights by threatening to lay off employees if the Union objected to removal of computer center employees from the bargaining unit. The Union also claimed that beginning September 10, 1987, Illinois–American had failed and refused to bargain collectively and in good faith by removing the computer center employees from the bargaining unit and by refusing to recognize the Union as representative of computer center employees.

The hearing on these grievances occurred before an ALJ on February 8 and 9, 1988. The ALJ found that despite Illinois–American's contention to the contrary, the CIRs should be included in the East St. Louis district office bargaining unit. According to the ALJ, the CIRs performed the same basic functions as those performed in the district offices before the computer center opened, and the result of the endeavors of the two employee groups remained the same. He also determined that the offices are functionally integrated, the supervision is similar due to the overall control by Conner, and that the terms and conditions of employment are not substantially different. These findings led to the ALJ's ultimate determination that Illinois–American failed to show that the computer center employees are sufficiently dissimilar from the bargaining unit and that Illinois–American violated sections 8(a)(5) and (1) of the Act by refusing to recognize the Union as the exclusive bargaining representative of the computer center employees. He also found that Illinois–American violated section 8(a)(1) of the Act through Conner's threats of termination of unit employees if

the Union insisted on representing the computer center employees as members of the East St. Louis bargaining unit. Regarding the Union's earlier grievance on the information problem, the ALJ concluded that the information requested by the Union in its letter of May 30, 1987, was relevant to the Union's function as bargaining unit representative, and that Illinois–American violated sections 8(a)(5) and (1) by refusing to furnish that information. The Board affirmed the ALJ's rulings, findings and conclusions and adopted the ALJ's order with an addition on the matter of compliance with the order as to information to be supplied.[6] The Board then ordered Illinois–American to cease and desist from the unlawful conduct found by the Board; to honor, upon request, the collective bargaining agreement and to apply it to the computer center employees; and to make the computer center employees whole for losses suffered by Illinois–American's failure to apply the agreement to them.

## II. ANALYSIS

### A. Standard of Review

The Board found that Illinois–American violated sections 8(a)(1) and (5) of the Act. In reviewing a decision of the Board, "we are constrained to uphold the Board's determination if it is supported by substantial evidence in the record." *NLRB v. American Printers and Lithographers*, 820 F.2d 878, 881 (7th Cir.1987). As we stated in *NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir.1991), "[t]his standard of review does not allow us to dabble in fact-finding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case de novo." We now examine the Board's findings in light of this standard.

### B. Threat of Termination

The Board found that Illinois–American violated section 8(a)(1) of the Act because

---

**6.** The Board modified the Order to require Illinois–American to furnish to the Union the information requested in the letter of March 30,

1987. The ALJ inadvertently failed to include that requirement in the initial order.

of Conner's threats that bargaining unit employees would be terminated if the Union insisted that the computer center employees be considered part of the East St. Louis bargaining unit. It is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their section 7 rights. 29 U.S.C. § 158(a)(1). Section 7 gives employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157.

■ In making this section 8(a)(1) finding, the ALJ considered conflicting testimony. Goodrick testified that in March 1987, in a meeting attended by Goodrick, two Union stewards, Illinois–American supervisors and Conner, Conner stated that the Union's representation demands would result in the hiring of new employees and the firing of unit employees. While the testimony by Goodrick, Conner and Union steward Mary Allen differed as to the actual date of this meeting and the people in attendance, the ALJ found that Conner's failure to deny that he made such comments in the presence of Union stewards justified crediting Goodrick's testimony and therefore the ALJ found that Conner made such a threat.[7]

■ Credibility determinations such as this "are to be made by the ALJ and the Board, and will not be overturned by a reviewing court absent extraordinary circumstances." *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 687 (7th Cir. 1982); *see also NLRB v. Roselyn Bakeries, Inc.*, 471 F.2d 165, 167 (7th Cir.1972) (duty of reviewing court to recognize the Board's ability to "judge the impact of the statements made in the context of the employer-employee relationship.") Extraordinary circumstances worthy of overturning a credibility determination include bias by the ALJ or the ALJ's disregard for sworn

testimony. *Berger,* 678 F.2d at 679. No such circumstances exist in this case.

Illinois–American contends that there was no 8(a)(1) violation because Conner's statement was not threatening, coercive or intimidating and was not motivated by anti-union animus. The economic dependency of the employee on the employer makes the employee extremely sensitive to employer statements, therefore we "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).

■ An employer may express views about union representation, "so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' " *Id.* at 618, 89 S.Ct. at 1942. In considering whether a statement constitutes a threat to the right of self-organization, the test "is not whether an attempt at coercion has succeeded or failed, but whether the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their section 7 rights." *Berger,* 678 F.2d at 689. *See NLRB v. Ajax Tool Works, Inc.,* 713 F.2d 1307, 1313 (7th Cir.1983). The statement made by Conner indicated that Illinois–American would retaliate against unit employees if they attempted to retain their Union representation. Conner uttered this threat to the Union representative and stewards, key figures with respect to the bargaining unit.

The positions of many of the district office unit employees were not going to be necessary after computerization. Employees who wished to maintain the bargaining unit status for computer center employees therefore faced the choice of representation or loss of employment. Such employer action is exactly what section 8(a)(1) is meant to prevent. Given our standard of

---

**7.** Conner did not deny making such statements to the Union stewards, and stated only that

Goodrick was not present at the meeting with the stewards.

deference to the ALJ and the Board and our reading of the testimony concerning Conner's statement, we accept the Board's credibility determination and we find that the Board's decision is supported by substantial evidence. We agree with the Board's finding that Illinois–American violated section 8(a)(1) of the Act.

## C. The Appropriate Bargaining Unit

Section 8(a)(5) of the Act provides that an unfair labor practice occurs when an employer "refuse[s] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Union representation is explained in section 9(a), which states "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining...." 29 U.S.C. § 159(a). The Board concluded that the computer center employees should be included in the East St. Louis bargaining unit and that Illinois–American violated sections 8(a)(5) and (1) by failing to recognize the CIRs as bargaining unit employees.

In beginning our examination of these violations of the Act, we first consider what constitutes an appropriate bargaining unit. In adopting the decision of the ALJ, the Board found the appropriate bargaining unit to be: "All office employees employed by [Illinois–American] at its Belleville computer center, and Granite City and East St. Louis District Offices, EXCLUDING employees performing group insurance and/or pension duties, other confidential employees, guards, and supervisors as defined in the Act." [8]

■ After a bargaining unit determination, the employer is required to recognize and bargain with the union as the representative of the unit employees. *NLRB v. Bay Shipbuilding Corp.*, 721 F.2d 187, 190 (7th Cir.1983) (*enforcing* 263

N.L.R.B. 1133 (1982)). As *Bay Shipbuilding* explains, "[t]his obligation does not expire automatically when technological innovations affect the jobs of some of the employees in the unit. Rather the employer's obligations depend on whether the changes in job structure are so significant that the existing bargaining unit, including the affected employees, is no longer appropriate." *Id.* When such changes occur, the burden is on the employer to show "sufficient dissimilarity" to warrant severance from the bargaining unit. *NLRB v. United Technologies Corp.*, 884 F.2d 1569, 1572 (2d Cir.1989) (citing *Bay Shipbuilding*, 263 N.L.R.B. at 1140, *enforced*, 721 F.2d at 191). The Board found that Illinois–American failed to sustain that burden. After reviewing the facts, we find that the Board's decision is supported by substantial evidence.

■ The need to maintain a fixed bargaining unit is a central element to the congressional purpose of "stabilizing labor-management relations in interstate commerce." *United Technologies*, 884 F.2d at 1572. For this reason, "once the bargaining unit is established by the collective bargaining agreement or by NLRB action, an employer may not remove a job within the unit without either the approval of the Board or consent of the union." *Id.* In this case, Illinois–American unilaterally removed the computer center employees from the district office bargaining unit. Illinois–American did not just create jobs that were non-Union positions, but instead removed the transferred East St. Louis employees from their bargaining unit, leaving them with no Union representation.

■ To determine an appropriate bargaining unit, the "Board looks to the bargaining history and the 'community of interest,' or lack thereof." *American Printers and Lithographers*, 820 F.2d at 881. As *Bay Shipbuilding* explains, "community of interest factors rather than strict definitions are the proper benchmarks for making unit determinations." 721 F.2d at 191. Illinois–American contends that the

**8.** On January 18, 1991, the Board reaffirmed its decision regarding the appropriateness of this bargaining unit in a related case between Illinois–American and the Union. *Illinois–American Water Company, Southern Division and Office and Professional Employees Internat'l Union,* 301 N.L.R.B. No. 23 (1991).

Board's decision is not consistent with the traditional application of community of interest principles.

■ As outlined in *Ralph Rogers & Co. v. NLRB*, 870 F.2d 379, 384–85 (7th Cir. 1989),

> [s]ome of the factors used by this circuit in determining whether a group of employees share a community of interests include: (1) the geographic proximity of the work sites; (2) a history of collective bargaining; (3) the degree of functional integration of the employer's operations; (4) the centralization of management and labor relations functions; (5) similarity in skills, employee benefits, wages and hours of work; and (6) the degree of employee interchange among the company's sites.

*See also NLRB v. Speedway Petroleum*, 768 F.2d 151, 155 n. 4 (7th Cir.1985). The issue to be considered following this community of interest analysis is whether a single bargaining unit comprised of the two groups would be appropriate. Illinois–American contends that the Board ignored the differences between the computer center employees and the East St. Louis unit employees. This is hardly the case. The ALJ's opinion enunciates the differences, but states that the differences are not substantial and do not merit the removal of the computer center employees from the bargaining unit. We agree.

Some of the differences listed by Illinois–American are trivial, such as the geographic distance between the Belleville computer center and the East St. Louis office. The offices are located ten miles apart; however, it is difficult to consider that as a negative factor for the Union since the bargaining unit under the 1986 agreement consisted of workers from the Granite City, East St. Louis and Belleville offices.

A key difference, according to Illinois–American, is the level of skills and training required for the different positions, as well as the equipment used. The ALJ and Board, however, did not agree and determined that the CIRs performed the same basic functions as did the district office employees before the computer center opened. Perhaps most importantly, the end result of their respective tasks remained the same. The Board determined that the offices are functionally integrated, the supervision is similar because of Conner's overall supervision, and that the terms and conditions of employment are substantially the same.

The *Bay Shipbuilding* and *United Technologies* cases concerned employment changes similar to the Illinois–American changes. In *Bay Shipbuilding*, the employer introduced computerization to the shipbuilding process of lofting. All of the loftsmen assigned to the new computerized department previously worked in the manual lofting department. The manual loftsmen were in the bargaining unit represented by the union, but the company determined that the loftsmen in the computerized department should not be in the bargaining unit. The ALJ and Board found, and this court agreed, that because both positions required the same basic skills, were under the same ultimate supervision and maintained substantial interaction, all lofting employees—manual or computerized—should be included in the original bargaining unit. 721 F.2d 187.

A similar situation arose in *United Technologies*, where the Board found that the position of control coordinator was an updated version of two previous positions "with minor changes attributable to new technology." 884 F.2d at 1572. So it is with the Illinois–American computer center employees—the differences are superficial alterations. *Id.* at 1573.

Illinois–American does not acknowledge that the duties of the employees in East St. Louis, who are undoubtedly in the bargaining unit, as well as the unit employees who became CIRs, have changed as a result of the computer center. An overlapping of the current functions of the computer center employees and the East St. Louis employees constitutes the work performed by unit employees before the opening of the computer center. Of course, some new functions are now being performed at the computer center, but this is simply a result of technological advances.

The ALJ described the situation with the computer center employees as a "hybrid"

or "converse" accretion. *Consolidated Papers, Inc. v. NLRB*, 670 F.2d 754, 756–57 (7th Cir.1982), explains that

[a]n accretion is the addition of a relatively small group of employees to an existing bargaining unit where these additional employees share a sufficient community of interest with unit employees and have no separate identity. The additional employees are then absorbed into the existing unit without first having an election and are governed by the unit's choice of bargaining representative.

The common accretion situation occurs when new employees are absorbed into an existing unit because of the similarity of their job duties to those of the unit employees. The courts exhibit heightened concern when applying the accretion doctrine because the accreted employees receive union representation without voicing their own choice through an election. *Consolidated Papers*, 670 F.2d at 757 n. 4. To a certain extent, an accretion interferes with the employees' "freedom to choose their own bargaining agents." *Id.*

The reason the ALJ labeled the situation in this case as a "hybrid" is because Illinois–American employees came from within an existing unit and moved into new positions as a result of company organizational changes and technological advances. This was not a situation where the union tried to add completely new employees into an existing unit. Instead of an accretion that interfered with the freedom of the employees to choose their own bargaining agent, the Illinois–American policy actually robbed the transferred unit employees of their chosen representation.

Illinois–American argues that the Board erred in its accretion determination. We note that the Board's decision of accretion is comparable to a determination of an appropriate bargaining unit. *Lammert Industries v. NLRB*, 578 F.2d 1223, 1225 (7th Cir.1978). Thus, in reviewing that determination, we will not set aside the Board's decision unless we find that the Board acted arbitrarily and capriciously. *Id. See also Consolidated Papers*, 670 F.2d at 757. Our review of the evidence does not cause

us to find that the Board's determination regarding the hybrid accretion and its inclusion of the computer center employees in the bargaining unit was arbitrary or capricious.

Having considered the relevant factors, we accept the Board's decision to include the computer center employees in the district office bargaining unit. We also find that the Board acted properly in finding that Illinois–American violated sections 8(a)(5) and (1) by failing to recognize the Union as exclusive bargaining agent for both the computer center employees and district office employees, and by failing to grant to the Union and computer center employees the rights that accompany that bargaining unit decision.

### D. Information Request

■ As part of the section 8(a)(5) duty to bargain, an employer has a duty to furnish all information requested by a union that is necessary to the union in order for it to fulfill its obligation as representative of bargaining unit employees. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967); *NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 833 (7th Cir.1988); *NLRB v. Pfizer, Inc.*, 763 F.2d 887, 889 (7th Cir.1985). Illinois–American failed to comply with the Union's request that it provide the Union with the name, address, home phone number, birth date, social security number, employment dates, and type of employment for each bargaining unit employee.

■ Illinois–American contends that it did not violate section 8(a)(5) by refusing to supply personal employee information because it did not have the consent of its employees. Illinois–American also argues that it should not have had to bear the burden of providing information already available to the Union. An employer "may defend against a request for information by showing that there is a clear and present danger that the union will use the information to harass employees." *Burkart Foam*, 848 F.2d at 833. Similarly, an employer may argue, as does Illinois–American, that it is withholding information to protect the privacy interests of its employees. The burden is on the employer

to show a "legitimate claim to confidentiality," and Illinois–American failed to sustain that burden. *Pfizer*, 763 F.2d at 891.

 The evidence did not show that the employees made any requests to Illinois–American that it refrain from disclosing personal employee information. The Union requested the information because it was in the process of storing member information in a new computer system. The Union submitted similar information requests to all employers with employees represented by the Union, and all but Illinois–American complied with the request.

 The Board may determine that the employer has a duty to provide information if it finds even "a probability that the information is relevant and that it will be of use to the union in carrying out its statutory duties." *Pfizer*, 763 F.2d at 889. Because a "discovery-type" standard should be used in considering relevance of the requested information, " 'a broad range of potentially useful information should be allowed the union for the purpose of effectuating the bargaining process.' " *Id.* at 889–90 (quoting *Procter & Gamble Manufacturing Co. v. NLRB*, 603 F.2d 1310, 1315 (8th Cir. 1979)). *See also General Electric Co. v. NLRB*, 916 F.2d 1163, 1168 (7th Cir.1990) (relevance most often viewed liberally to allow for broad disclosure of information). *General Electric* notes that "[s]ome information requested by unions is 'presumptively relevant' because it relates directly to unit employees and their conditions of employment and therefore goes to the core of the employer-employee relationship." *Id.* at 1171. Names, addresses, phone numbers and the rest of the information requested by the Union, basic employee information, certainly could be considered presumptively relevant. *Id.* at 1167. Regardless, given the expansive standard for disclosure of information, we find that the Board correctly determined that Illinois–American violated the Act by failing to provide the Union with the requested information.

### III. CONCLUSION

Substantial evidence supports the Board's finding that Illinois–American violated sections 8(a)(1) and (5) of the National Labor Relations Act through its actions with respect to Union representation for the computer center employees and the refusal to furnish information requested by the Union. For the foregoing reasons, the Board's order is Enforced.