**MARY THOMPSON HOSPITAL, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 89–3464, 89–3681.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1990.

Decided Sept. 16, 1991.

Norman P. Jeddeloh (argued), Komie & Associates, Chicago, Ill., for petitioner.

Richard A. Cohen (argued), N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Howard E. Perlstein, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Elizabeth Kinney, Dawn Miller, Tamara Tanzillo, and Harvey A. Roth, N.L.R.B., Region 13, Chicago, Ill., for petitioner.

Before COFFEY, RIPPLE and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After Mary Thompson Hospital failed to provide the Hospital Employees Labor Program of Metropolitan Chicago (the "Union")[1] with information concerning an affiliation agreement with Bethany Hospital or the Evangelical Health System, the Union brought an unfair labor practice charge against the Hospital. An administrative law judge concluded that the Hospital had violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, and ordered the Hospital to supply the requested information to the Union. A three-member panel of the National Labor Relations Board subsequently affirmed his findings and conclusions. The Hospital petitions for review of the Board's decision; the Board cross-petitions for enforcement of its order.

I.

Mary Thompson Hospital, named for the pioneering female physician who founded it shortly after the Civil War, experienced severe financial difficulties in early 1987. In an effort to cut costs, the Hospital laid off employees, froze its hiring, and reduced employee benefits. These efforts were too little, too late, and the Hospital soon realized that it would be unable to continue to provide adequate health care services to its patients. By the fall of 1987, with its financial condition continuing to deteriorate, the Hospital was left with no choice but to initiate discussions with other hospitals and health care providers—specifically, Bethany Hospital and the Evangelical Health System—about a possible merger or affiliation. Attempts to arrange a merger or affiliation, however, were unsuccessful. As a result, the Hospital's board of directors concluded in January, 1988, that the Hospital had no other option but to cease operations.

Shortly after reaching this decision, Hospital administrators met with the Hospital's employees and union representatives to discuss its financial situation. Rather than disclose that the Board had decided to close the Hospital, the administration affirmatively misled the employees by "informing" them that the Hospital "was ... having discussions with several other hospitals or health care providers [about] the possibility of either an affiliation or merger." In a second meeting the next week, the administrator informed the employees that "an affiliation had taken place and had been approved ... to team the [Hospital] with EHS" and that, as a result, certain medical departments would be transferred to Bethany.[2]

Later in March, Clara Day, the Union's business manager, became aware that the Hospital's oncology department would be transferred to Bethany. To discuss this development, Day phoned Gwen Rodriguez, the Hospital's personnel administrator, and set up a meeting. In their meeting, Day pointed out to Rodriguez that the Union had a comparable bargaining unit at Bethany and wanted to bargain about issues (such as dovetailing seniority rights) if there were going to be any transfers. Although aware that there would be no affiliation or merger, Rodriguez informed Day that she could not answer these questions because the terms of the affiliation were not yet settled.

---

1. The Union's small bargaining unit in the Hospital represented the Hospital's non-professional employees—licensed practical nurses, patient care attendants, ward clerks, utility attendants, and housekeeping and dietary employees.

2. The Hospital later justified these misleading statements by noting that massive employee defections, a likely result of a closing announcement, would have prevented the Hospital from providing adequate service to its patients during the close-down period.

On March 22, 1988, representatives of the Hospital and Union met to discuss the terms of a new collective bargaining agreement. The brief meeting rehashed the parties' previous discussions of the Hospital's financial situation and concluded with the parties agreeing to reconvene on March 31 (the day the old agreement was to expire) for further discussions.

The Hospital informed its employees that it was closing at the second meeting. Accordingly, the Union's plan to negotiate a new collective bargaining agreement turned into a negotiation over the effects of the Hospital's closure. However, in the meetings, the Hospital continued to talk about a possible affiliation with EHS. In light of this announcement, the parties concluded that they would extend the collective bargaining agreement for a month and begin discussing the effects (transfers, cutbacks, severance) the closing/affiliation would have on the Hospital's employees.[3]

At the April 22 meeting to discuss the closure, Stephen Rubin, the Union's attorney, requested information that would enable the Union to determine whether the layoffs had followed contractual seniority. He also inquired as to why the Hospital had failed to inform the Union of its closing in a more timely fashion. In addition, Rubin expressed an interest in seeing the affiliation agreement and wanted to know if "there was anything in the affiliation agreement which related to bargaining unit employees." In response, Norman Jeddeloh, the Hospital's attorney, stated that the "agreement was not as good as the hospital would have liked," and promised to examine the affiliation agreement to see if any of its provisions related to the Union's members. Rubin again requested various information, including the "affiliation agreement" and made demands for severance pay and accrued benefit payments.

When the parties met again a week later, the Hospital provided the Union with the requested seniority information, but failed to produce the requested portions of the affiliation agreement. The Union renewed its request for the relevant sections of the document. And once again, the Hospital's attorney promised he would "look for any provisions in the affiliation agreement which relate[d] to bargaining unit employees." Two days later, the Hospital shut its doors permanently.

Rubin contacted Jeddeloh in May, 1988 to let him know that the Union planned to proceed with unfair labor practice charges against the Hospital. In their telephone conversation, Rubin again asked Jeddeloh if he had reviewed the affiliation agreement for any provisions relating to bargaining unit employees and was informed that Jeddeloh had not. Rubin reiterated the Union's position that it wanted to examine the document (especially those portions dealing with bargaining unit employees) and memorialized his telephone request in a letter to Jeddeloh.

Over a month later, the Union had still not received a response from the Hospital concerning its request to examine the affiliation agreement. Accordingly, Rubin sent a letter to Jeddeloh noting that "[i]n the event that you are unable to identify any such portions, we request a copy of the entire Agreement so that we can ascertain whether such portions exist or not." The letter also affirmed the Union's willingness to discuss any valid confidentiality concerns the Hospital had with respect to the document. The Hospital never responded to this letter.

The Union eventually brought an unfair labor practices charge against the Hospital, alleging that the Hospital had unlawfully refused to furnish it with a copy of the affiliation agreement with EHS.[4] During the unfair labor practice hearing, Rodriguez, the Hospital's personnel administrator, testified that the Hospital had not en-

---

**3.** The Hospital had already laid off a number of employees prior to the meeting.

**4.** A consolidated complaint also alleged that the Hospital had unilaterally discontinued a contractually-mandated pension plan covering both its bargaining unit and its non-unit employees.

The Board affirmed the administrative law judge's conclusion that the Hospital had lawfully discontinued its pension fund contributions under its collective bargaining agreement. This issue is not before us on appeal.

tered into an affiliation agreement with EHS. However, she stated that she had seen two documents—one dealing with the transfer of the Hospital's oncology department to Bethany and a Community Continuity Assurance Agreement between the Hospital and Bethany. She also testified that the Continuity Agreement addressed the Hospital's sale of the Near West Medical Center to EHS, the transfer of the oncology department to Bethany, the transfer of the Hospital's medical staff to Bethany, the continuation of the Hospital's name and tradition of community service, the mutuality of service areas between Bethany and the Hospital, and the division of patients and service areas between Bethany and the Hospital. No other testimony or evidence concerning the Continuity Agreement was elicited during the administrative hearing.

The administrative law judge concluded (and the Board later agreed) that the Hospital had violated §§ 8(a)(5) and (1) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(5) and (1)) by "unlawfully with[holding] from the Union information requested concerning the discontinuance of its operations and its affiliation with another hospital." Accordingly, the Board ordered the Hospital to provide the Union with the Oncology Transfer Document, the Community Continuity Assurance Agreement, and any other documents concerning the transfer of the Hospital's assets, personnel, operations and good will to Bethany or EHS.[5]

## II.

█ Under section 8(a)(5) of the National Labor Relations Act, an employer engages in an unfair labor practice when it "refuse[s] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). As a part of this duty to bargain, an employer must furnish all requested, relevant information "that is necessary to the union in order for it to fulfill its obligation as representative of bargaining

unit employees." *NLRB v. Illinois–American Water Co.*, 933 F.2d 1368, 1377 (7th Cir.1991) (citing *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967); *NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 833 (7th Cir. 1988); *NLRB v. Pfizer, Inc.*, 763 F.2d 887, 889 (7th Cir.1985)). "Relevance in this context is determined under a 'discovery-type' standard ... and thus 'a broad range of potentially useful information should be allowed the union for the purpose of effectuating the bargaining process'" and its statutory duties. *Pfizer*, 763 F.2d at 889–90 (quoting *Procter & Gamble Mfg. Co. v. NLRB*, 603 F.2d 1310, 1315 (8th Cir.1979)); *see also General Elec. Co. v. NLRB*, 916 F.2d 1163, 1168 (7th Cir.1990).

█ On appeal, the Hospital maintains that the Board erred in its conclusion that the requested information is relevant and must be supplied to the Union. Our standard is well-established when reviewing the Board's decision that an employer violated sections 8(a)(1) and (5) of the Act: we must uphold the Board's (predominantly factual) determination if it is supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Illinois–American Water Co.*, 933 F.2d at 1373; *General Electric Co.*, 916 F.2d at 1168. In this context, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support" the Board's conclusion. *Roadmaster Corp. v. NLRB*, 874 F.2d 448, 452 (7th Cir.1989) (quoting *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459); *see also National By–Products, Inc. v. NLRB*, 931 F.2d 445, 451 (7th Cir.1991). "This standard of review does not allow us to dabble in fact-finding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case de novo." *NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir.1991); *see also Illinois–Ameri-*

---

5. The Hospital has since provided the Union with a copy of the Oncology Transfer Agreement.

can Water Co., 933 F.2d at 1373. Nonetheless, we will not act as a rubber stamp for the Board's decision, but will "examine all of the evidence in context to ensure that the Board's findings fairly and accurately represent the picture painted by the record." *NLRB v. Harvestone Mfg. Corp.*, 785 F.2d 570, 574–75 (7th Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986).

■ We start with the Hospital's contention that its due process rights were violated because it lacked notice that the Board would require it to turn over various documents—the Continuity Agreement and other documents relating to the transfer of various assets of the Hospital to Bethany and EHS—which were not part of the Union's original unfair labor practice charge. We disagree. The Union's unfair labor practice charge alleged that the Hospital had refused to provide it with an affiliation agreement containing information relevant to the Union's statutory duties. Throughout the various meetings dealing with the closure, Hospital officials (not just Union representatives) had consistently referred to the information the Union seeks as the "affiliation agreement" with Bethany or EHS. Indeed, Rodriguez's hearing testimony indicates that she used the term "affiliation" because it encompassed the general concept of the relationship the Hospital was attempting to establish with another health care provider. Moreover, the Hospital's attorney repeatedly promised to review the "affiliation agreement" for any provisions relevant to bargaining unit employees. It is too late now for the Hospital to contend that the requested affiliation agreement did not (indeed could not) exist because the Hospital's closure proves that it did not affiliate or merge with another health care provider, or to argue that the Continuity Agreement had nothing to do with an affiliation. The Board's order did not unlawfully expand the reach of the Union's request; it merely required the Hospital to provide the Union with the information both parties understood the Union to have been requesting all along.

In the present case, the Board did not assume the requested information was presumptively relevant.[6] *See, e.g., General Electric Co.*, 916 F.2d at 1171 (information relating "directly to unit employees and their conditions of employment ... goes to the core of the employer-employee relation" and is presumptively relevant) (citing *WCCO Radio, Inc. v. NLRB*, 844 F.2d 511, 514 (8th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988)). Rather, in its order (incorporating the administrative law judge's findings), the Board provided several reasons why the information in the affiliation or Continuity Agreement may be relevant to the Union's statutory duty to bargain on behalf of its membership. First, the Union was entitled to bargain about work-preservation issues with the Hospital; indeed, it owed a duty to engage in such an activity to its membership. A review of the documents in dispute might better allow the Union to assess whether the Continuity Agreement's failure to transfer unit employees was the result of unlawful considerations, such as Bethany's desire to avoid hiring the Hospital's more senior, union employees who were entitled to higher salaries and more costly benefits. Indeed, as the Board notes, if this information reveals that the Hospital has a relationship with Bethany, the Union may also be able to make a colorable claim for jobs against Bethany. The requested information is also conceivably relevant to issues of severance pay and accrued benefit payments since it may indicate sources of funds out of which the employees could satisfy any claims. More-

6. Although not the grounds relied upon by the Board in reaching its decision, in similar circumstances a union's request for information concerning an employer's contract to sell its business has been held presumptively relevant because the situation required mandatory effects-bargaining. *See NLRB v. New England Newspapers, Inc.*, 856 F.2d 409, 413 (1st Cir. 1988) ("Because [the contract to sell the newspa- per] has to do with the termination of employment and thus concerns a 'condition of employment,' ... it 'is presumptively relevant and must be disclosed ...'") (citations omitted). Because we find that the Continuity Agreement (and related documents) are relevant for the reasons stated by the Board, we do not address the issue of whether this type of information is presumptively relevant.

over, if the Hospital's affiliation with EHS or Bethany bolstered the Hospital's financial situation, the Union was entitled to this information when bargaining for these claims. We therefore conclude that, "given the expansive standard for disclosure of information," *Illinois–American Water Co.,* 933 F.2d at 1378, substantial evidence supports the Board's determination that the Continuity Agreement (as well as any related documents) is relevant to the Union's statutory duties.

■■ The Hospital also maintains that the documents requested by the Union contain sensitive and confidential information. Therefore, it believes that the Union should be required to make a strong showing of relevance or an inability to obtain the necessary information from other sources before the Board may order the Hospital to provide the requested documents. To be sure, "[a] union's bare assertion that it needs information ... does not automatically oblige the employer to supply all the information in the manner requested." *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 314, 99 S.Ct. 1123, 1131, 59 L.Ed.2d 333 (1979); *see also General Electric Co.,* 916 F.2d at 1167–68. But, our cases place the burden of demonstrating a legitimate claim of confidentiality on the employer resisting production of the information. *Pfizer, Inc.,* 763 F.2d at 891; *NLRB v. Custom Excavating, Inc.,* 575 F.2d 102, 106 (7th Cir.1978). In this case, the Hospital made no showing—other than its bare assertion—that the information it seeks to protect is confidential.[7] It did not attempt to narrow the scope of the Union's request for information; nor did it discuss its confidentiality concerns, or possible methods of alleviating them, with the Union. In any event, our case law holds that the Hospital's failure to demonstrate that the requested materials contain sensitive and confidential information prevents it from defeating the Union's request for possibly relevant information. *See, e.g., Pfizer, Inc.,* 763 F.2d at 891.

■ Along similar lines, the Hospital maintains that the Union should be required to demonstrate that it was unable to obtain the requested information through other sources before the Board can require an employer to turn over confidential materials. As an alternative to the Continuity Agreement, the Hospital suggests that the Union could obtain the information concerning job opportunities at Bethany through personnel offices or from job postings. This argument misses the point. Even if the Union had obtained the information from other sources, it was entitled to review the Continuity Agreement in order to verify the data it obtained through alternative sources. *See Custom Excavating, Inc.,* 575 F.2d at 106; *Anaconda Wire & Cable Co. v. NLRB,* 444 F.2d 1028, 1036 (7th Cir.1971) (need for verification makes it immaterial that union can secure desired information from its membership).

Any other issues raised by the Hospital are without merit and warrant no further discussion.

### III.

The Board's finding that the Hospital committed an unfair labor practice by failing to provide the Union with the affiliation agreement, continuity agreement and other documents relating to it is supported by substantial evidence. These documents satisfy the broad relevance standard of the National Labor Relations Act and the Union is therefore entitled to review and evaluate the requested documents. We hereby DENY the Hospital's petition for review and grant the Board's cross-petition to ENFORCE its decision and order.

---

**7.** At oral argument, counsel for the Hospital stated that at least part of the agreement contained sensitive information concerning its medical staff. To tell us anymore, he noted, would destroy the confidential nature of the Continuity Agreement.